IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
BEAUFORT DIVISION

Susan K. Stevens,                          )
                                           )
                    Plaintiff,             )
                                           )
v.                                         )          C.A. No. 9:05-2657-PMD-GCK
                                           )
                                           )          **ORDER**
Del Webb Communities, Inc.,                )
                                           )
                                           )
                    Defendant.             )
_____)

   This matter is before the court upon the Magistrate Judge's recommendation that this court

grant Defendant Del Webb Communities, Inc.'s ("Del Webb" or "Defendant") motion for summary

judgment. The record includes a Report and Recommendation ("R&R") of a United States

Magistrate Judge, which was made in accordance with 28 U.S.C. § 636(b)(1)(B). A party may

object, in writing, to an R&R within ten days after being served with a copy of that report. 28

U.S.C. § 636(b)(1). Plaintiff has filed timely objections to the R&R.

## BACKGROUND

   On September 15, 2005, Plaintiff Susan K. Stevens ("Stevens" or "Plaintiff") filed her

complaint against Defendant, wherein she alleges that she was disciplined and ultimately terminated

on the basis of her sex in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000(e),

*et seq.* On October 7, 2005, Del Webb answered Plaintiff's complaint, denying Plaintiff's

substantive allegations. Thereafter, on April 10, 2006, Del Webb filed a motion for summary

judgement, to which Plaintiff filed a response in opposition. Del Webb filed a reply to Plaintiff's

response. Subsequently, at the request of the Magistrate Judge, the parties filed a joint factual brief.

On June 20, 2006, the Magistrate Judge filed a 34-page R&R recommending that this court grant

Del Webb's motion for summary judgement.  Plaintiff filed objections to the R&R on July 10, 2006, and Defendant filed a response to Plaintiff's objections.

Pursuant to the parties' joint factual brief, the parties have agreed upon the following facts:

In January of 2003, Glenda Morgan ("Morgan"), Vice President of Sales for Del Webb, interviewed and hired Plaintiff as a sales associate; the employment relationship was at-will.  During Stevens' tenure with Del Webb, all three of her supervisors, Morgan, Elizabeth Cain ("Cain"), and Joanne Sutcliffe ("Sutcliffe"), were women.  On her first day of work, Stevens received and signed a job description setting forth her duties as an employee.  This job description required Stevens "to communicate properly to the appropriate departments any customer request for information or services" and "to work efficiently and cheerfully in an environment which may be stressful due to adversarial situations resulting from the performance of the department's mission."

Del Webb paid Stevens on commission for performing her job duties, which included showing and selling single-family homes, condos, and lots in Del Webb's Sun City development in Hilton Head, South Carolina.  During the first year of Stevens' employment, she and a male sales associate, Art Kelly, became partners.  Kelly and Stevens shared all commissions and split the seven-day work week so that one of them was in the office every day.  It is undisputed that Kelly and Stevens were among the top in sales for their category.

During Stevens' employment, Del Webb conducted weekly sales meetings, at which management provided the staff with information regarding pricing, lot releases, home standards, and other business concerns.  Morgan preferred that sales associates, regardless of their sex, did not raise issues in sales meetings because one of the reasons for sales meetings was to inspire the sales associates to prepare them to make sales.  Stevens believed that during these meetings, management,

particularly Morgan, "never cared to have any input from the sales people . . . Very unopen to any kind of new ideas, therefore if you broached a new subject with them[,] they would try to put you in your place, so to speak." Stevens claimed that even when male sales associates raised issues, management "might not always be nice about it, but sometimes they would say well, see me about that later . . . ." Stevens believed that Jack Tuney ("Tuney") could verify that "[Morgan] was never one to solicit opinions from salespeople and that when they did it would get shut down." Stevens testified that Tuney had "learned not to say anything because he was afraid of [Morgan] as well." Tuney testified that "Stevens and I would both speak very openly in meetings, the morning meetings. I learned to stop. She never did."

Early in her employment, Stevens was counseled following a sales meeting in which she openly challenged management's pricing decisions. One of her supervisors, Cain, verbally warned her that the company "would not tolerate salespeople being disruptive, that it was none of [her] business how [properties were] priced, and if [she] was disruptive like that in the future she could be asked to leave."

At some point, Stevens informed management that "in California[,] we wouldn't dream of building a house without a smooth ceiling because you could never sell it." Stevens testified that she "would throw [this criticism] in a lot," so much so that it became a "joke" within the office and her co-workers began to refer to smooth ceilings as "California Susan ceilings." Ross Turpin stated that "[i]t seemed like in a majority of the sales meetings, [Stevens] would raise the issue of popcorn ceilings. She would not let it drop." Also, Reid McCall testified that "Stevens repeatedly brought up the issue of popcorn ceilings during sales meetings." Greg Price stated that, "[w]hile other sales associates may be outspoken, the difference was that [Stevens] was not outspoken in a diplomatic

3

way.  For example, when bringing up popcorn ceilings, she would say 'my customers do not like them' and 'that is not how they do it in California' in a tone of voice that was not diplomatic."

Stevens expressed her belief that the Sun City Development was "20 years behind the times." Stevens explained that Morgan did not understand that the property was behind the times because "she [was] not from the west where the west is more progressive in home building.  California typically sets the standard for the rest of the country in home building contracts and everything else."  One of Stevens' co-workers stated that "if a manager disagreed with her, she would say that out in California, we did it this way."  Reid McCall testified that "Stevens could come across very mean during sales meetings," and Carole Richardson testified that she "truly remember[ed Stevens] as being challenging in sales meetings."

Stevens' managers believed that she disrupted sales meetings by engaging in distracting conversation with co-workers.  On one occasion, Stevens disrupted a meeting by talking with a co-worker, and at the next meeting, Morgan asked Stevens to sit in front with her so she would not talk. Ross Turpin stated that while he believed that separating Stevens "was totally unprofessional, this may have been a knee jerk reaction to [Stevens'] constant badgering."  Turpin stated that a couple of times, he had been afraid that Stevens would be asked to leave the meeting.

Melba Burns Windham thought being separated was humiliating for Stevens.  While Windham felt that Morgan "relates better to men than she does with women," Windham believed that "we all relate to a particular gender better than we do to the other," and that it is "not necessarily a negative or a positive."  Windham testified that Morgan was a good manager and that she did not think Morgan was capable of deliberately discriminating because of "sex, race, or anything like that."  Stevens testified that she was not humiliated by being separated at the meeting because she

4

was "pretty thick skinned." During the sales meetings that Stevens attended, she did not recall male sales associates being asked to sit in the front of the room. However, Morgan recalls asking male sales associate Mike Martin to move to the front of the room to prevent him from talking during a meeting, and Veronica Cadman recalls Morgan asking male associate Rick Malone to move to the front of the room during a sales meeting. According to Plaintiff, on other occasions, Morgan sat between male associates to prevent them from talking during meetings.

On March 31, 2004, Stevens received a performance evaluation completed by Morgan. The evaluation indicated that Stevens needed to improve her performance in five areas: (1) Core Values, defined as "[c]ommunicating and living by a set of non-negotiable core values; helping to define and apply the work group and organization's culture, value and ethics;" (2) Agreement, defined as "[b]uilding consensus, developing win-win solutions, resolving situational conflicts;" (3) Organizational Learning, defined as "[a]nticipating problems and trends, seeking continuous improvement, learning from mistakes;" (4) Vision, defined as "[u]nderstanding organizational vision and applying it to person vision, inspiring others;" and (5) Strategic Direction, defined as "[b]uying into corporate strategic initiatives, focusing on steps necessary to achieve strategy." Morgan believed that Stevens was not a good employee because, despite her sales goals, these were "very strong points [] that needed to be improved upon." Stevens does not claim that any other sales associate received more favorable treatment in his or her evaluation.

In July of 2004, Stevens had an incident with Heddy McCraw, a decorator for Del Webb. Specifically, while McCraw was adding flower arrangements to the lobby as Morgan had instructed her to do, Stevens asked McCraw "do we have to have big flower arrangements like that? Why can't we stick to the small flower arrangements?" Stevens had no authority over McCraw or the

decor of the model.  Sutcliffe testified that McCraw was so upset about the incident that she reported to her "almost in tears," claiming that "Stevens was abrupt and rude and asked why she was putting the foliage on the tables, and they don't need to be there."  Stevens believes McCraw lied about the incident "because she was coached by management for purposes of this deposition and trial."

On July 7, 2004, an altercation occurred between Stevens and Kelly Dale, a member of the Design Center staff.  Stevens claims she approached Dale because a client's calls had not been returned and that she asked Dale to contact the client so he would know "the design center [had] not forgotten him."  Stevens claims that Dale agreed to call the client but failed to do so.  According to the Design Center staff, Stevens initiated a verbal altercation with Dale in the presence of another co-worker.  Sutcliffe testified that she met with the Design Center staff first, and then she met with Stevens to "hear her side of the story."  Sutcliffe issued a verbal warning to Stevens for raising her voice and becoming demanding toward Dale.  Sutcliffe told Stevens that she needed to apologize to Dale for having raised her voice, but according to Sutcliffe, Stevens refused to apologize to Dale at that time. Stevens testified that she did not recall whether she refused to apologize.  Sutcliffe testified that she then talked to Morgan, who told her that Stevens had to apologize or be issued a written warning and be required to leave the premises.  According to Sutcliffe, because Stevens refused to apologize, she issued a written warning to Stevens, which Stevens refused to sign until after speaking with Morgan.  Stevens slammed her door behind Sutcliffe after she left.

After a heated discussion with Morgan, Stevens refused a direct order to leave the premises.  Stevens signed the written warning after being informed that she would be terminated if she continued to refuse to sign it.  Because Stevens refused to leave, Morgan realized that she "had a Human Resources issue" and, therefore, Morgan told Stevens that she was to "stay in [her] office

and [she was] not to leave.  [She was] not to talk to anyone."

The written warning placed Stevens on 30-day probation and stated that she "must be able to control [her] emotions when discussing problems within our work environment."  Sutcliffe stated that Stevens could not "just spurt things out and hurt people's feelings and demand things from [her] co-workers.  That is being very aggressive."  The next week, Stevens apologized to Dale and Amato Ostas.

When asked whether Stevens ever met the terms of the written warning, Sutcliffe testified that "there were incidences after that occurred, several," and "there were other complaints that had preceded that warning."  Sutcliffe also testified that Stevens did not meet the terms of the warning because of the issue with McCraw, which occurred during the same week as the written warning. It is unclear whether the incident with McCraw occurred before or after the written warning.

Following the July 7, 2004, incident, Stevens was out of the office on vacation for two weeks.  When she returned from her vacation, Del Webb received three complaints from customers regarding Stevens.  Stevens and Morgan also testified that Stevens received a fourth complaint, from the Mustachios, though it is unclear whether that complaint came before or after the written warning.

With regard to the fourth complaint, Morgan testified that she received a call from the Mustachios who were "very, very upset, threatening to sue because they had given [Stevens] a credit card number and told her they wanted to buy a waterfront lot."  The Mustachios complained that Stevens never generated a contract to hold the lot they desired, resulting in the lot being sold to another party.  As she had done with other associates, Morgan used this incident to coach Stevens on following procedures but did not formally discipline her.  Stevens does not recall this discussion but stated that it is possible that it occurred.

7

On July 27, 2004, Cain received a complaint from Mr. Christianson, who informed Cain that he had provided Stevens with a credit card number to hold a particular lot. Stevens never completed the necessary paperwork and never provided Mr. Christianson with a contract, and ultimately, another customer purchased the lot. Stevens' partner, Kelly, called Mr. Christianson to inform him that the lot had been sold and offered him another lot. Mr. Christianson "didn't want anything to do with the different lot," and he was so upset that he threatened to sue Del Webb. Stevens' failure to complete the necessary paperwork was a direct violation of Del Webb's employment "Guidelines & Rules for Sun City Hilton Head," which Stevens admitted she had been provided and understood.

Sutcliffe testified that on August 9, 2004, Mr. and Mrs. Steger came into the office and asked to speak with a manager. The Stegers reported that they had met with Stevens and asked her if they could look at a property. Stevens informed the Stegers that she was too busy to take them and that "they should not go over there without her because she would have to share her commission." The Stegers reported that Stevens directed them to visit a model park and that she would talk to them when they returned if she was not too busy then. When the Stegers returned, Stevens was not in the office, and Sutcliffe testified that Stevens never followed up with the Stegers. Stevens testified that she does not remember this specific incident, but that "if it happened, what I probably said was I am too busy to take you over there right now. If you don't mind would you like to go look at the models and when you come back I will be happy to take you over there. And you probably understand if I send you over there on your own I would have to share the commission."

Sutcliffe testified that on August 11, 2004, another customer complained about Stevens. On this occasion, Mr. and Mrs. Crabtree spoke to Dorothy Apgar and Dan Denney expressing their interest in Del Webb's River Bend property. The Crabtrees told Apgar and Denney that they

previously had met with Stevens, who refused to show them a property. Stevens claimed that the Crabtrees may have been induced to fabricate this claim at the behest of Denney, who Stevens claims was trying to keep all of the commissions in the River Bend development, but Stevens admits that she has no evidence to substantiate this claim.

Morgan testified that it is not required to always notify an employee when a notice was put into his or her personnel file, but that she generally counseled sales associates about any complaints. Morgan testified that she counseled Stevens with respect to only one of the four complaints, and that she did not discuss the other three complaints with Stevens until her termination.

Sutcliffe testified that on August 11, 2004, Jody Hurley, a new sales associate, told her that Stevens made her feel unwelcome by telling her that nobody wanted her there. Allegedly, Stevens told her that the sales associates did not want her or other new associates around because it was "splitting up the pie," and "they could have handled it without the new salespeople."

On August 16, 2004, Stevens met with Morgan and Cain and reviewed the incidents in her file. After this meeting, Sutcliffe and Mandy Michaels, a human resources representative, informed Stevens that she was being terminated for aggressive behavior and for not being a team player. The specific instances identified during discovery as leading to Stevens' termination include: (1) being argumentative during weekly sales meetings; (2) acting demeaning toward other co-workers and engaging in heated discussions with co-workers and supervisors; (3) ignoring management instructions, including Stevens' initial refusal to apologize as directed by management and her refusal to leave the premises when instructed to do so; and (4) improper handling of customers.[1]

---

[1] Because these reasons were identified during discovery, Plaintiff feels that they are not relevant in considering Defendant's motion for summary judgment.

Morgan testified that it was unusual for a sales associate to receive four documented complaints in such a short period of time. Jack Tuney testified that his experiences with Stevens "were all positive" and that "[s]he always handled [his] people very, very well and [he had] no complaints whatsoever, or [Stevens] wouldn't have been [his] backup." Tuney testified that Stevens "was very pleasant to me" and that he never observed Stevens treating anyone in a disrespectful manner. Melba Burns Windham testified that she enjoyed working with Stevens, and she thought Stevens was one aggressive salesperson and very good at sales. Carole Richardson felt that Stevens behaved in a pleasant manner toward other sales people. Veronica Cadman testified that she never observed Stevens being disrespectful or demeaning to anyone. Art Kelly stated that Stevens was well-liked and a team player, helpful to others, and treated others with respect.[2]

Sutcliffe testified that a "team player" interact[s] with his or her co-workers, helps, is pleasant, and is nonaggressive. Sutcliffe testified that Stevens was aggressive in a negative way because she was demeaning and demanding, and she was the only sales associate about whom co-workers complained about aggressiveness. Sutcliffe testified that male co-workers "sometimes" received complaints for being "bossy," and that they were "probably" written up for such behavior. Sutcliffe testified that Stevens did not meet the terms of her probation due to incidents that occurred before and during the probationary period. After being fired, Stevens "looked [Sutcliffe] straight in the eye and [] said I will sue your fat ass."

After her termination, Stevens wrote a letter to Greg Duriez, Southeast Area President for

---

[2] Del Webb believes that these statements are irrelevant because it is well-established in the Fourth Circuit that the opinions of co-workers are irrelevant. In assessing a plaintiff's performance, only the opinions of the employer are relevant. *See, e.g.*, *King v. Rumsfeld*, 328 F.3d 145, 149 (4th Cir. 2003); *Tinsley v. First Union Nat'l Bank*, 155 F.3d 435, 444-45 (4th Cir. 1998); *Hawkins v. PepsiCo., Inc.*, 203 F.3d 274, 280 (4th Cir. 2000).

Pulte Home Corporation, disputing her termination.  Pulte treated her letter with the utmost seriousness and sent a representative from the corporate office to conduct two days of interviews at Del Webb's Sun City development.  After a thorough investigation of Stevens' claims, Duriez stated, "we [found] no reason to alter the prior decision made by the local team."

On January 3, 2005, Stevens filed a Charge of Discrimination with the South Carolina Human Affairs Commission, alleging discrimination on the basis of her sex and age.  The Commission determined that there was insufficient evidence to support Stevens' claims.

On September 15, 2005, Stevens filed the present suit alleging that she was disciplined and ultimately terminated on the basis of her sex; she alleges that "she was disciplined and terminated for conduct condoned in male associates."  Also, she believes that "[t]his is subtle sex discrimination . . . . It is the kind of discrimination that you just feel by innuendo and looks that you get in the hall and passing little comments that probably really don't in and of themselves mean anything."

## DISCUSSION

### I.    Legal Standard For Summary Judgment

To grant a motion for summary judgment, the court must find that "there is no genuine issue as to any material fact."  Fed. R. Civ. P. 56(c).  The judge is not to weigh the evidence but rather to determine if there is a genuine issue for trial.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986).  All evidence should be viewed in the light most favorable to the non-moving party.  *Perini Corp. v. Perini Constr., Inc.*, 915 F.2d 121, 123-24 (4th Cir. 1990).  "[W]here the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, disposition by summary judgment is appropriate."  *Teamsters Joint Council No. 83 v. Centra, Inc.*, 947 F.2d 115, 119 (4th Cir. 1991).  "[T]he plain language of Rule 56(c) mandates the entry of summary judgment,

11

after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The "obligation of the nonmoving party is 'particularly strong when the nonmoving party bears the burden of proof.'" *Hughes v. Bedsole*, 48 F.3d 1376, 1381 (4th Cir. 1995) (quoting *Pachaly v. City of Lynchburg*, 897 F.2d 723, 725 (4th Cir. 1990)).    Summary judgment is not "a disfavored procedural shortcut," but an important mechanism for weeding out "claims and defenses [that] have no factual bases." *Celotex*, 477 U.S. at 327.

## II.    The Magistrate Judge's R&R

The Magistrate Judge makes only a recommendation to this court.  The recommendation has no presumptive weight, and the responsibility for making a final determination remains with the court. *Mathews v. Weber*, 423 U.S. 261, 269 (1976).  The court reviews *de novo* those portions of the R&R to which a specific objection is made, and the court may accept, reject, or modify, in whole or in part, the recommendation of the Magistrate Judge, or recommit the matter to him with instructions.  28 U.S.C. § 636(b)(1)(C).  After a thorough review of the entire record, the R&R, and Stevens' objections, the court finds that the Magistrate Judge fairly and accurately summarized the facts and applied the correct principles of law.  Therefore, the court adopts the Magistrate Judge's R&R in full and incorporates it herein by specific reference.

## OBJECTIONS

On July 10, 2006, Plaintiff filed objections to the Magistrate Judge's R&R, wherein she asserts (1) that there is a genuine issue of material fact as to the reasons given for Stevens' termination; (2) that there is no evidence that Plaintiff failed to comply with the probationary terms;

(3) that there is a genuine issue of material fact as to whether Defendant's stated reasons for termination were accurate; (4) that there is a genuine issue of material fact as to Defendant's alleged disparate treatment of female sales associates; and (5) that whether Plaintiff engaged in unacceptable behavior subsequent to her probation is a genuine issue in dispute that requires a trial. As the court explains below, Plaintiff's objections are wholly without merit, and it is more than clear to this court that Defendant Del Webb is entitled to summary judgment.

## I.    The Reasons Given for Plaintiff's Termination

In Stevens' first objection, she asserts that a genuine issue of material fact exists regarding the reasons given for her termination. Specifically, Stevens asserts that the R&R fails to focus on the reasons given for Plaintiff's termination at the time of termination and focuses only on the reasons uncovered during discovery.[3]  With regard to the reasons given for termination at the time of termination, Sutcliffe and a human resources representative informed Plaintiff that she was being terminated for aggressive behavior and for not being a team player. The incidents identified during discovery as leading to Stevens' termination included: (1) being argumentative during weekly sales meetings; (2) acting demeaning and condescending to other employees, and engaging in heated discussion with co-workers and supervisors – including the situations involving co-workers

---

[3]  On page 26 of the R&R, the Magistrate Judge states:

Defendant agrees that Stevens was, in part, "ultimately fired for being aggressive and not being a team player." More specifically, as Defendant argues, based upon the Undisputed Facts, Stevens was terminated for being argumentative during weekly sales meetings; acting demeaning and condescending to other employees; engaging in heated discussions with co-workers and supervisors; ignoring management instructions; and improperly handling customers.

(R&R at 26.)

13

McCraw, Hurley, and members of the Design Center staff and slamming the door of her office behind Sutcliffe; (3) ignoring management instructions, including Stevens initially refusing to apologize to Design Center staff as directed by management and refusing to leave the premises when instructed to do so; and (5) improper handling of customers.

According to the parties' joint factual brief, at the time of termination, Plaintiff met with Morgan and discussed *each of the incidents* documented in her personnel file. Thus, while the reasons for termination identified during discovery may be more specific than the more general reasons given to Plaintiff at the time of termination, it is simply infeasible that the more specific reasons uncovered during discovery somehow came as a shock to Plaintiff. Moreover, it is clear that the specific reasons, while perhaps disputed by Plaintiff, do not deviate from the general reasons, but rather, they provide further evidence in support of the general reasons. Stated differently, the specific reasons identified during discovery simply provide precise examples of how Plaintiff was "aggressive and not a team player." *See Mayfield v. Patterson Pump Co.*, 101 F.3d 1371, 1377 (11th Cir. 1996) (stating that specific examples given by employer for termination were not inconsistent with broad explanation set forth at time of termination). Ultimately, because Del Webb's stated reasons both at the time of termination and during discovery amply provide a non-discriminatory, non-pretextual basis for termination, Plaintiff's attempt to create a genuine issue of material fact where there is none must fail. Accordingly, the court finds Plaintiff's first objection without merit.[4]

---

[4] In this objection, Plaintiff also claims: "The report states that Morgan testified that she did not always counsel sales associates when they received complaints. This is in error as Morgan testified that she would normally discuss complaints with sales associates." What Plaintiff fails to recognize is that just because someone "normally" does something does not mean that someone "always" does something. Moreover, according to the parties' joint factual brief, "Morgan testified that, although *it is not required to always notify the employee* that you have put a notice in [his or her] personnel file, when sales associates receive complaints, they are *generally* counseled regarding

14

## II.    Evidence of Plaintiff's Failure to Comply with the Probationary Terms

In her second objection, Stevens asserts that there is no evidence that she failed to comply with the probationary terms.[5]  The court finds this objection to be no more than a red herring, in that Plaintiff cunningly attempts to tie her termination directly to, and only to, her failure to comply with probationary terms.  In other words, Plaintiff seems to be under the false impression that she could not be fired for any reason other than violating the written requirements of her probation.  However, it is clear that Del Webb expected Plaintiff to live up to the job description she signed on her first day of employment, and it is clear that management found her job performance to be lacking in many respects.  Thus, the fact that Stevens' incident with McCraw may have occurred before her probation, and/or the fact that Plaintiff disputes at least three of the customer complaints, does not diminish the importance of these incidents.  Regardless, while a failure to comply with probationary terms may or may not have factored into Del Webb's decision to terminate Plaintiff, the record reflects that Del Webb's decision to terminate Plaintiff for being "aggressive and not a team player" was well within its province and clearly encompassed more than a failure to comply with probationary terms.  Accordingly, the court finds Plaintiff's second objection without merit.

## III.    The Accuracy of Defendant's Stated Reasons for Termination

Stevens asserts that the R&R failed to consider the opinions of Stevens' co-workers.  However, on page 26 of the R&R, the Magistrate Judge states:

> With respect to defining a "team player," Sutcliffe said a team player interacts with
> co-workers, helps others, [is] pleasant, and [is] nonaggressive.  Tuney said Stevens

---

the matter."  (Jt. Fact. Br. at 17.) (emphasis added).

[5]  Plaintiff's written warning stated that she "must be able to control [her] emotions when discussing problems within our work environment."

15

was very pleasant to him and he never observed Stevens treating anyone in a disrespectful manner. Richardson believed Stevens behaved in a pleasant manner toward other sales people. Cadman thought Stevens was well-liked, willing to help[,] and [she] never observed Stevens being disrespectful or acting in a demeaning manner to anyone. Art Kelly, Stevens' partner, said she was well-liked and a team player, helpful to others[,] and treated others with respect.

Defendant contends that the facts demonstrate that Plaintiff was not a "team player" because she did not interact well with her co-workers, she was unpleasant, and she was aggressive, as reflected by various conflicts involving co-workers, supervisors, and customers. Defendant argues that the fact that some of Plaintiff's co-workers testified that she was a "team player" is irrelevant. Indeed, it is well settled in the Fourth Circuit that the opinions of co-workers are irrelevant in assessing a plaintiff's performance. Only the opinions of the employers are relevant. *See, e.g., King v. Rumsfeld*, 328 F.3d 145, 149 (4th Cir. 2003); *Tinsley v. First Union Nat'l Bank*, 155 F.3d 435, 444-45 (4th Cir. 1998); *Hawkins v. PepsiCo., Inc.*, 203 F.3d 274, 280 (4th Cir. 2000).

(R&R at 26-27.) Nevertheless, Plaintiff contends that the facts in *Rumsfeld* are distinguishable from the present case because the co-workers were assessing Rumsfeld's *performance*, whereas in the present case, Plaintiff's co-workers offered opinions on her interaction with them and whether she was a team player. The court finds this to be a distinction without a difference, as it is clear that Plaintiff's interaction with her co-workers is necessarily part and parcel of her job performance. In fact, Plaintiff's job description required her "to communicate properly to the appropriate departments any customer request for information or services" and "to work efficiently and cheerfully in an environment which may be stressful due to adversarial situations resulting from the performance of the department's mission." As the Magistrate Judge pointed out, it is clear in the Fourth Circuit that "[i]t is the perception of the decision maker which is relevant . . . . , not the opinions of [] co-workers or other third parties." *See Tinsley*, 155 F.3d at 444. Thus, the fact that a selected group of Stevens' co-workers believed that Stevens was a team player does not replace Del Webb management's reasonable determination that she was not. Nor do the selected group of

16

co-workers' opinions generate a genuine issue of material fact, especially in light of the undisputed facts supporting Del Webb's determination. Moreover, as Defendant points out, Plaintiff's assertion that "[w]ithout exception, the co-workers testified that Stevens treated them well and was a team player" is not entirely true, as it overlooks the complaints made by Plaintiff's supervisors, other Del Webb employees, and customers. In light of the aforementioned, the court finds Plaintiff's third objection that the R&R failed to consider the opinions of her co-workers without merit.

## IV.    Defendant's Alleged Disparate Treatment of Female Sales Associates

In her fourth objection, Stevens asserts that there is a genuine issue of material fact as to Del Webb's alleged disparate treatment of female associates. In support of her assertion, Stevens states that the R&R failed to consider the testimony of Donna MacDonald, who testified that Morgan treated male sales associates more favorably than females.[6] Plaintiff asserts that "[t]he Report fails to take into consideration that the other witnesses are all either current employees dependant upon Defendant for their jobs, or in related businesses which also depend upon defendant's goodwill."[7] (Obj. at 3.) Plaintiff's reliance on MacDonald's testimony to create a genuine issue of material fact

_____

[6] In its reply to Plaintiff's response in opposition to the motion for summary judgment, Defendant asserts that MacDonald's declaration makes a host of false allegations, and not one relates to Plaintiff. For instance, Defendant asserts that MacDonald's claims that she was fired while on leave and was wrongfully denied leave under the Family and Medical Leave Act are both false because MacDonald was permitted a leave of absence but never returned to work. Moreover, she was not eligible for leave under the FMLA because she had not been employed by Del Webb for the requisite 12-month period at the start of her leave. Defendant points out that MacDonald's assertion that no male associates were disciplined is likewise false because the record demonstrates that male associates were, in fact, both disciplined and discharged.

[7] The court finds this statement particularly interesting given that Plaintiff objects to the Magistrate Judge making an improper credibility determination, and then she seems to turn around and ask this court to do that to which she just objected by insinuating that all of the witnesses who are current employees of Defendant or who depend upon Defendant's goodwill must be lying.

is misplaced for several reasons.

First, as the Magistrate Judge points out in footnote 44, MacDonald's employment predated Stevens' employment.  Second, none of MacDonald's assertions relate in any way to Plaintiff.  Rather, MacDonald asserts that she observed an incident of alleged disparate treatment involving another employee, Veronica Cadman.  However, Cadman herself testified:

> Q.    Do you think based on your experience that management, Glenda [Morgan],
>       Joanne  [Sutcliffe] when she was there, Elizabth [Cain] showed favoritism
>       toward men sales associates?
> A.    No, because I have seen them get in – reprimanded too if they have done
>       something that management feels is inappropriate.
> Q.    So you feel there is equal treatment –
> A.    Yeah.
> Q.    – between the men and the women?
> A.    Between the men and the women, yes.

(Cadman Depo. at 25:6-17.)   In any event, as the Magistrate Judge properly concluded, "MacDonald's statement, standing alone, does not raise a genuine issue of material fact, given the testimony of other witnesses," and especially in light of the fact that none of MacDonald's assertions in any way relate to Plaintiff's termination.  (R&R at 30.)

Moreover, Plaintiff's fundamental misunderstanding of the meaning of "aggressive" in the context of her termination does not raise a genuine issue of material fact.[8]  In her objections, Plaintiff

---

[8]  As Defendant asserts in its reply to Plaintiff's memorandum in opposition to summary judgment:

> Plaintiff notes that Morgan made clear that she was referring to "aggressive" only
> in the context of a sales associate position being "consistent, persistent, and
> aggressive" with respect to selling properties.  Throughout her Reponse, Plaintiff
> attempts to alter the meaning of the word "aggressive" as used by Del Webb
> management – inclined to behave in an actively hostile fashion – to an alternative
> definition of the same word – assertive, bold, and energetic.  Clearly the same word,
> in different contexts, may have a positive or negative meaning in an employment
> setting.  It is beyond question that Del Webb did not discipline Plaintiff for being

18

complains that "Morgan and Sutcliffe both testified as to aggressiveness being a good thing in a sales associate," and that "she was fired for a reason (aggressiveness and not being a team player) that is suspect . . . ." (Obj. at 4.) Plaintiff continues: "The magistrate . . . states that 'the court has determined that there were many differences in the 'aggressive' behavior of Price (a male sales associate) and Plaintiff.' The court does not instruct further as to what these differences were." (Obj. at 4.) However, quite the contrary to Plaintiff's assertion, the Magistrate Judge provides a great deal of instruction as to those differences. For example, the R&R provides:

> Plaintiff claims that Greg Price "blew up in [the] contracts [Department] one time screaming and yelling at everybody back there, and he got no performance – written warning to my knowledge and he certainly wasn't fired." Defendant admits that Price was involved in an incident in the Contracts Department; Price immediately was verbally reprimanded for his conduct, and Morgan's reprimand was so direct that Price feared he would be fired over the incident. Morgan testified that when she told Price he needed to apologize he said, "you are exactly right. I do." According to Morgan, Price "went right down and apologized" and Morgan believes Price "even bought them lunch the next day as an apology."

> Although Plaintiff likewise had "vented" at the Design Center staff on July 7, 2004 because that staff had not contacted Plaintiff's client, it does not appear that Plaintiff and Price were "similarly situated" because Plaintiff and Price responded differently to their supervisors' criticisms of their conduct. With respect to Plaintiff, . . . Sutcliffe told Plaintiff to apologize to Kelly Dale for having raised her voice, but according to Sutcliffe, Plaintiff refused to apologize at that time. Plaintiff testified that she had no recollection as to whether or not she refused to apologize at that time. Sutcliffe testified that she then spoke with Morgan, who told Sutcliffe that Stevens had to apologize or be issued a written warning and be required to leave the premises. Sutcliffe testified that, because Stevens refused a direct order . . . , Sutcliffe issued a written warning for Plaintiff, which Plaintiff still refused to sign until after speaking with Morgan. Plaintiff admits that when Sutcliffe left, Plaintiff slammed the door behind her. After a heated discussion with Morgan, Stevens refused a direct order to leave the premises. Stevens signed the written warning after

_____

"assertive, bold, and energetic," but rather because she behaved in an "actively hostile fashion."

(Reply at 6-7.)

being informed by Morgan that she would be terminated if she continued to refuse to do so. Because Stevens refused to leave, Morgan realized that she "had a Human Resources issue" and, therefore, Morgan told Stevens that she was to "stay in [her] office and [she was] not to leave. [She was] not to talk to anyone."

In contrast, after Price was reprimanded by Morgan, he did not respond by raising his voice to her; he did not slam the door behind her; and he did not refuse a direct order by her. Thus, Price's conduct did not come close to the seriousness of that of Plaintiff's conduct. Unlike Plaintiff, Price apologized immediately to the persons he yelled at, and subsequently bought lunch for the entire Contracts Department staff. Furthermore, there is no evidence that Price had any other disciplinary problems of any kind. There are significant differences between Plaintiff's conduct and Price's conduct, and therefore the court concludes that Price is not a similarly situated male.

(R&R at 17-19.) Likewise, because Plaintiff engaged in misconduct of greater seriousness than Price, the Magistrate Judge determined that Plaintiff could not show that any male sales associate was given more favorable treatment than her. Ultimately, in light of the aforementioned, the court finds that Plaintiff's fourth objection fails, as there is no genuine issue of material fact regarding Del Webb's alleged disparate treatment of female associates, and Plaintiff's remaining claims amount to no more than inaccurate generalizations.

## V.    Whether Stevens Engaged in Unacceptable Behavior Following Probation

In her final objection, Plaintiff asserts that whether she engaged in unacceptable behavior following her probation is a genuine issue in dispute that requires a trial. However, the court finds Plaintiff's assertion incorrect because, as discussed in relation to Plaintiff's second objection, this assertion is no more than a red herring. The record reflects that management made the decision to terminate Plaintiff for being "aggressive and not a team player," as evidenced by Plaintiff's: argumentative behavior during sales meetings; her interactions with co-workers and supervisors; her failure to follow management instructions; and her improper handling of customers. The evidence of record, including those facts agreed to by the parties in their joint factual brief, provides ample

20

non-discriminatory, non-pretextual reasons in support of Del Webb's decision to terminate Plaintiff. Thus, the court finds no genuine issue of material fact with respect to whether Plaintiff engaged in unacceptable behavior following her probations. "[A] plaintiff's own assertions of discrimination in and of themselves are insufficient to counter substantial evidence of legitimate nondiscriminatory reasons for an adverse employment action. And no court sits to arbitrate mere differences of opinion between employees and their supervisors. *Hawkins*, 203 F.3d at 281 (internal citations omitted); *see also Goldberg v. B. Green & Co., Inc.*, 836 F.2d 845, 848 (4th Cir. 1988) (stating that Plaintiff's own opinions and conclusory allegations do not have sufficient "probative force to reflect a genuine issue of material fact").

## CONCLUSION

It is, therefore, **ORDERED,** for the foregoing reasons that Defendant's motion for summary Judgment is **GRANTED.**

**AND IT IS SO ORDERED.**

PATRICK MICHAEL DUFFY
United States District Judge

**Charleston, South Carolina**
**September 8, 2006**

21